Case No. 22-10024

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

**UNITED STATES OF AMERICA,**

Plaintiff/Appellee,

v.

**ARMANDO DANIEL CALDERON,**

Defendant/Appellant.

_____/

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA
N.D. Cal. No. 3:18-cr-00290-WHA-7

– ooOoo –

**APPELLANT'S OPENING BRIEF**

ELIZABETH GARFINKLE
P.O. Box 13172
Oakland, CA 94661
lizgarfinkle@gmail.com
(510) 501-0542
Attorney for Appellant/Defendant
Armando Daniel Calderon

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ 1

TABLE OF AUTHORTIES ................................................................. 3

ISSUES PRESENTED ......................................................................... 8

PERTINENT CONSTITUTIONAL PROVISIONS, STATUTES, & RULES ........................................................................................... 9

JURISDICTION ................................................................................. 10

BAIL STATUS .................................................................................... 11

STATEMENT OF THE CASE............................................................ 11

   I.   District Court Proceedings..................................................... 11

   II.  Trial Evidence ........................................................................ 13

      A. Evidence Offered in Support of Counts 13 and 14, from August 20, 2018. ..................................................................... 13

      B. Evidence Offered in Support of Counts 8 and 10, from September 2018. .................................................................... 14

SUMMARY OF THE ARGUMENT .................................................. 27

LEGAL ARGUMENT ........................................................................ 30

   I.   The Evidence Supporting Counts 13 and 14 Should Have Been Suppressed, because It Was Obtained Pursuant to an Illegal Search and Seizure, in Violation of the Fourth Amendment. ........................................................................... 30

      A. Relevant Facts ..................................................................... 30

      B. Legal Standards................................................................... 36

C. The Government Did Not Establish Calderon's Truck Inevitably Would Have Been Available to Lawfully Search, Absent Officer Carboni's Illegal Search and Seizure............ 37

II. THERE WAS INSUFFICIENT EVIDENCE OF THE CHARGED CONSPIRACY. .................................................................... 44

A. Standard of Review.................................................... 44

B. The Charged Conspiracy Requires Proof of Calderon's Agreement with Jimenez to Advance Further Distribution, with their Shared Stake in the Venture............................... 45

C. The Government Failed to Prove Calderon Conspired with Jimenez. ........................................................ 49

III. THE JURY RECEIVED PLAINLY-ERRONEOUS INSTRUCTIONS AND VERDICT FORMS. ............................................................ 57

A. Standard of Review.................................................... 57

B. The Omission of the Drug-Conspiracy Element of an Agreement to Commit a Further Crime, with a Shared Stake therein, Was Plain Error, which Violated Calderon's Substantial Rights. ............................................... 58

1. Relevant Instructions. ........................................ 58

2. Analysis. .......................................................... 60

C. The Inclusion of Extraneous Information Suggesting Broader Conspiracies, and the Omission of the Specific-Unanimity Requirement and Jimenez from the Instructions and Verdict Forms, Were Plain Errors. ............................... 68

1. Relevant Instructions. ........................................ 68

2. Analysis. .......................................................... 70

D. The Inclusion of "Conspired" in the Possession Counts' Verdict Forms Was Plain Error.............................................. 73

IV. APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.......77

    A. Legal Standard. ..................................................................... 77

    B. Trial Counsel Provided Deficient Representation. ............... 78

        1. Counsel Unreasonably Failed to Request the Jury Be Instructed on the Drug-Conspiracy Element of an Agreement to Commit a Further Crime and Argue It Was Not Satisfied. .......................................................... 78

        2. Counsel Unreasonably Failed to Object to the Omission of Conspiracy's Specific-Unanimity Instruction. .............. 81

        3. Counsel Unreasonably Failed to Object to Erroneous Verdict Forms. ................................................................. 83

        4. Counsel Made an Erroneous and Prejudicial Concession on Conspiracy to Possess with Intent to Distribute. ........ 84

        5. Counsel Failed to Object to a Suggestive Demonstrative. 87

    C. There is a Reasonable Probability of Different Outcomes, Absent Counsel's Errors. ....................................................... 90

CONCLUSION .................................................................................. 92

STATEMENT REGARDING RELATED CASES ............................. 93

CERTIFICATION REGARDING FORMAT AND SERVICE OF BRIEF.............................................................................................. 93

## TABLE OF AUTHORTIES

**CASES**

*Arizona v. Gant*, 556 U.S. 332 (2009).................................................. 38

*Bourjaily v. United States*, 483 U.S. 171 (1987) ................................. 56

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943).............. passim

*Evanchyk v. Stewart*, 340 F.3d 933 (9th Cir. 2003) ........................... 60

*Florida v. Wells*, 495 U.S. 1 (1990).......................................................43

*Iannelli v. United States*, 420 U.S. 770 (1975)....................................54

*Jackson v. Virginia*, 443 U.S. 307 (1979)............................................44

*Maiden v. Bunnell*, 35 F.3d 477 (9th Cir. 1994) ................................78

*Martin v. Maggio*, 711 F.2d 1273 (5th Cir. 1983) ..............................79

*Miranda v. City of Cornelius*, 429 F.3d 858 (9th Cir. 2005)... 38, 39, 43

*Nix v. Williams*, 467 U.S. 431 (1984) ...........................................36, 37

*People v. Centeno*, 60 Cal.4th 659 (2014) ...........................................90

*Soldal v. Cook County*, 506 U.S. 56 (1992) ...................................38, 39

*South Dakota v. Opperman*, 428 U.S. 364 (1976)..............................39

*Strickland v. Washington*, 466 U.S. 668 (1984)............... 77, 90, 91, 92

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) .......................................44

*United States v. Alferahin*, 433 F.3d 1148 (9th Cir. 2006) ......... passim

*United States v. Anderson*, 56 F.4th 748 (9th Cir. 2022)..............37, 39

*United States v. Bear*, 439 F.3d 565 (9th Cir. 2006)..........................31

*United States v. Bey*, 725 F.3d 643 (7th Cir. 2013)............................45

*United States v. Brown*, 726 F.3d 993 (7th Cir. 2013).......................46

*United States v. Burt*, 143 F.3d 1215 (9th Cir.1998) .........................61

*United States v. Cervantes*, 703 F.3d 1135 (9th Cir. 2012)................39

*United States v. Contreras,* 249 F.3d 595 (7th Cir. 2001). 50, 53, 56, 62

*United States v. Davis*, 854 F.3d 601 (9th Cir. 2017) ...................74, 84

*United States v. Diaz*, 190 F.3d 1247 (11th Cir.1999) ........................85

*United States v. Gaudin*, 515 U.S. 506 (1995) .................................... 60

*United States v. Gee*, 226 F.3d 885 (7th Cir. 2000) ............................ 66

*United States v. Gergen*, 172 F.3d 719 (9th Cir. 1999) ....................... 57

*United States v. Gill*, 650 Fed. Appx. 420 (9th Cir. 2016) ................. 54

*United States v. Heath*, 455 F.3d 52 (2d Cir. 2006) ........................... 36

*United States v. Hellman*, 556 F.2d 442 (9th Cir. 1977) ................... 38

*United States v. Jones*, 72 F.3d 1324 (1995) ................................. 41, 43

*United States v. Lapier,* 796 F.3d 1090 (9th Cir. 2015) ............. passim

*United States v. Lavan*, 10 F.Supp.2d 377 (S.D.N.Y.1998) ............... 36

*United States v. Loveland,* 825 F.3d 555 (9th Cir. 2016)........... passim

*United States v. Lundin*, 47 F. Supp. 3d 1003 (N.D. Cal. 2014)........ 40

*United States v. Matthews*, 849 Fed. Appx. 668 (9th Cir. 2021) ........ 45

*United States v. McClendon*, 713 F.3d 1211 (9th Cir.2013) .............. 36

*United States v. Mendoza*, 25 F.4th 730 (9th Cir. 2022) ........... passim

*United States v. Mims*, 92 F.3d 461 (7th Cir. 1996) .................. passim

*United States v. Moe*, 781 F.3d 1120 (9th Cir. 2015) ............. 63, 65, 83

*United States v. Montgomery*, 150 F.3d 983 (9th Cir. 1998) ............. 63

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) ............... 44, 45

*United States v. Olano*, 507 U.S. 725 ................................................ 57

*United States v. Orozco*, 858 F.3d 1204 (9th Cir. 2017)..................... 43

*United States v. Pelisamen*, 641 F.3d 399 (9th Cir. 2011)................. 45

*United States v. Place*, 462 U.S. 696 (1983) ................................ 38, 41

*United States v. Pulgar*, 789 F.3d 807 (7th Cir. 2015) ................. 46, 60

*United States v. Ramirez*, 714 F.3d 1134 (9th Cir. 2013) ........... passim

*United States v. Ramirez-Sandoval*, 872 F.2d 1392 (9th Cir. 1989) .. 40

*United States v. Rivera,* 273 F.3d 751 (7th Cir.2001) ......................... 47

*United States v. Rodriguez*, 971 F.3d 1005 (9th Cir. 2020) ............... 57

*United States v. Ruckes*, 586 F.3d 713 (9th Cir. 2009) ...................... 39

*United States v. Span*, 75 F.3d 1383 (9th Cir.1996) .................... 78, 80

*United States v. Thomas*, 284 F.3d 746 (7th Cir. 2002)..................... 56

*United States v. Torres*, 828 F.3d 1113 (9th Cir. 2016) ..................... 11

*United States v. Turnbow*, No. 18-00001, 2019 WL 654456 (D. Nev. 2019) ...................................................................................... 39

*United States v. Tyler*, 758 F.2d 66 (2d Cir. 1985)............................. 51

*United States v. Young*, 573 F.3d 711 (9th Cir. 2009) ....................... 40

*Wong Sun v. United States*, 371 U.S. 471 (1963)............................... 36

## STATUTES

18 U.S.C.

  § 924(c)................................................................................... 10, 12

  § 3231 ..................................................................................... 10

21 U.S.C.

  § 841 ........................................................................... 10, 11, 12, 58

  § 846 ................................................................................. passim

## CONSTITUTIONAL PROVISIONS

United States Constitution

  Fourth Amendment ................................................................. passim

Fifth Amendment .................................................................... passim

Sixth Amendment ................................................................. passim

Fourteenth Amendment ................................................................. 44

## OTHER AUTHORITIES

Federal Rules of Evidence

201 ...................................................................................... 76

801 ...................................................................................... 56

Ninth Circuit Model Instructions

11.1 ................................................................... 58, 59, 61

12.5 ...................................................................... passim

12.6 ...................................................................... passim

Former Model Instruction 9.19 ................................................. 59, 81

Former Model Instruction 9.19A ............................................ 59, 65

**ISSUES PRESENTED**

1. Should evidence obtained pursuant to an illegal search and seizure of Appellant's vehicle have been suppressed, because police had unlawfully prevented Appellant's cousin from taking the vehicle, and hence the evidence would not inevitably have been discovered by lawful means?

2. Was constitutionally-sufficient evidence presented to support the elements of conspiracy to distribute methamphetamine, including an agreement to commit a crime beyond a negotiated sale, where an informant used a prior seller to solicit another seller?

3. Was it plain error to omit an instruction on the drug-conspiracy element of an agreement to commit a crime beyond a mere sale, with a shared stake therein?

4. Was it plain error to omit conspiracy's specific-unanimity requirement from the instructions?

5. Was it plain error to ask the jury to select the amount of methamphetamine they found appellant *conspired* to possess in Count 10, which had charged actual possession?

6. Was trial counsel constitutionally ineffective for failing to argue the drug-conspiracy element of an agreement to commit a further crime was not satisfied, failing to object to the omission of an instruction on that element and conspiracy's specific-unanimity requirement, failing to object to the erroneous verdict forms and the provision of a suggestive demonstrative timeline, and making an erroneous and prejudicial concession on conspiracy to possess with intent to distribute?

## PERTINENT CONSTITUTIONAL PROVISIONS, STATUTES, & RULES

THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION
provides in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION
provides in pertinent part: "No person shall be … deprived of life, liberty, or property, without due process of law."

THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION
provides in pertinent part: "In all criminal prosecutions, the

accused shall enjoy the right … to have the Assistance of Counsel for his defense."

**21 U.S.C. § 841(a)(1)** provides:

(a) Unlawful acts: Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

**21 U.S.C. § 846** provides: Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## JURISDICTION

On October 11, 2018, Appellant Armando Daniel Calderon was indicted on four counts arising under 18 U.S.C. §§ 924(c)(1), and 21 U.S.C. §§ 841(a)(1)&(b)(1)(A) & 846. 6-ER-4-5. Six co-defendants were indicted of various distribution and conspiracy offenses. 6-ER-1398-1405. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

Calderon was convicted of all four counts on June 3, 2022, following a jury trial. 1-RT-11-15. On January 25, 2022, he was sentenced to 198 months in prison, with five years of supervised release. 1ER-10. The judgment and his timely notice of appeal were filed on January 26, 2022. 1-ER-2; 6-ER-1406. Accordingly, this is an appeal from a final judgment of the district court, giving this Court jurisdiction pursuant to 28 U.S.C. § 1291. *See United States v. Torres,* 828 F.3d 1113, 1116, 1124 (9th Cir. 2016).

## BAIL STATUS

Calderon is in federal custody, currently housed at the Oakdale Federal Correction Institute in Oakdale, Louisiana.

## STATEMENT OF THE CASE

### I. DISTRICT COURT PROCEEDINGS

On October 11, 2018, Calderon was charged in a superseding indictment with conspiracy to distribute and possess with intent to distribute 500 or more grams of methamphetamine, under 21 U.S.C. §§ 841(a)(1)&(b)(1)(A)(viiii) & 846, for Count 8; possession with intent to distribute 50 or more grams of methamphetamine, under 21 U.S.C. §§ 841(a)(1)&(b)(1)(A)(viiii), for Count 10; possession with intent to

distribute 500 or more grams of methamphetamine, under 21 U.S.C. §§ 841(a)(1)&(b)(1)(A)(viiii), for Count 13; and carrying a firearm during, in relation to, and in furtherance of a drug trafficking crime, under 18 U.S.C. § 924(c)(1), for Count 14. 6-ER-4-5. Six co-defendants were charged with various drug-related crimes. 6-ER-1398-1405.

On January 15, 2019, Calderon filed a motion to suppress the evidence in support of Counts 13 and 14, as obtained during an unlawful search of his truck during his arrest on an unrelated warrant on August 20, 2018. Dkt. #78.[1] An evidentiary hearing on the motion was held on May 1 and 2, 2019. 1ER-64-69. The court issued an order denying the motion on May 16, 2019, finding the evidence would have been inevitably discovered. 1-ER-56.

On June 25, 2019, Calderon filed a second motion to suppress evidence from a different vehicle driven by him on September 11, 2018. Dkt. #173. The court denied the motion on August 9, 2019, Dkt. #201, following a hearing held on July 30, 2019, Dkt. #194.

---

[1] "Dkt." refers to the docket of the Northern District of California, No. 3:18-cr-00290-WHA-7.

Following several continuances and substitution of counsel, a jury trial began on Calderon's four counts on June 14, 2021, without his co-defendants. Dkt. #399. He was convicted on all counts on June 23, 2021. 1-ER-11-15.

On January 25, 2022, Calderon was sentenced to 198 months imprisonment, with 138-month terms for each of Counts 8, 10, and 13, to be served concurrently, and 60 months consecutive for Count 14. 1-ER-10. The judgment and his timely notice of appeal were filed on January 26, 2022. 1-ER-2; 6-ER-1406.

## II. TRIAL EVIDENCE

### A. Evidence Offered in Support of Counts 13 and 14, from August 20, 2018.

The Government produced evidence at trial of searches of Calderon and his truck, finding 832.4 grams of methamphetamine, $5,363.50 cash, four cell phones, a scale, a gun, and ammunition. 2-ER-444-445, 478-79, 485-86, 493-94. Because the only appellate issue Calderon raises regarding Counts 13 and 14 challenge his denied motion to suppress this evidence, he details the facts related to those Counts presented at the evidentiary hearing on his motion in Part I.A

13

of the Legal Argument, *infra*, and omits the repetition of those facts that were presented at trial.

## B. Evidence Offered in Support of Counts 8 and 10, from September 2018.

In 2018, the federal Drug Enforcement Administration ("D.E.A.") investigated a methamphetamine distributor, Eric Jimenez, through the use of a confidential informant. 3ER-516-17, 522. The informant had made some small controlled buys of methamphetamine from Jimenez, whose supply line had changed after his prior source had been arrested. 3-ER-522-23, 594.[2] The informant recorded numerous phone calls and meetings, which Agent Li identified as between the informant, Jimenez, and eventually Calderon.[3] 3-ER-523, 536.

On August 27, 2018, the informant called Jimenez to arrange to buy a pound of methamphetamine. 3-ER-527-28; 4-ER-715-16; 6-ER-

_____

[2] Jimenez was charged in Count 8 with Calderon, and in Count 1 with a conspiracy between December 19, 2017, and April 17, 2018, with other co-defendants, but not Calderon. 3-ER-1398-1402.

[3] The recordings were primarily in Spanish, with written translations provided to the jury. *See* 6-ER-1270-1396.

1270-72. On August 28, in the Denny's parking lot in Redwood City, Jimenez removed a white bag from the trunk of his Scion and took it to the informant's Camaro. 3-ER-638-39; 4-ER-669. After briefly staying in the Camaro, Jimenez returned to his Scion and left. 3-ER-639-40; 4-ER-670-71. The informant asked if the product was clean, and Jimenez responded, "[it] should be. That is how it arrived." 6-ER-1275. The informant asked for the price and was told $2750. 4-ER-726; 6-ER-1275. The informant then mentioned a planned trip to Washington to re-sell between 10 and 15 kilos, and asked if Jimenez's people "could make a trip" and give him that amount at a good price. 4ER-726-28; 6-ER-1277-81. Jimenez said "I have another one over here that has cheaper ones and they're also good, … it's just a matter of asking." 6-ER-1279. Jimenez indicated he would call and "see if he wants to." 4-ER-729; 6-ER-1283.

On September 4, Jimenez sent the informant a text: "A friend will give them to you at 4,700 if you get five or more." 3-ER-532.

On September 11, the informant and Jimenez met again at the Denny's parking lot. 3-ER-599-600. Jimenez told him, "Well right now … what I have … is garbage. ¶ They're there if you could take them

out slowly. I don't think you want that, but I had told you that I have a cousin that … has that. ¶ Well, something good." 6-ER-1287-88.

> [W]e can see what he has right now …. I don't know what … exactly he has. I don't really mess with too many things, just whatever moves here…. They come to me all the time, that they have this and that, but well, if there's no clients for that, what for?

6-ER-1303. Jimenez additionally explained he has "grab[bed] some from them and it's okay…. It's good, yes." 6-ER-1290; *see also* 6-ER-1304 ("they have some decent, pretty good. I get it from them there, too.")

A man identified as Calderon arrived in a Jeep and joined the informant in his Camaro, sitting in the seat Jimenez had vacated for him. 3-ER-600-05; 4-ER-679-81. Jimenez talked to them through the window, and he and Calderon referred to each other as cousins. 3-ER-600-01; 6-ER-1305. The informant told Calderon he wanted to know he had something good, not trash, and Calderon guaranteed that if he did not like something he gave him, he would exchange it, so they could continue working. 4-ER-772; 6-ER-1306-07. The informant explained he had a trip in two weeks, "[w]hat price can you guys give me? … You guys talk the price over, so you can give it to me

16

afterwards – him to me. I don't want to go over anyone's head." 6-ER-1308.

The informant asked Jimenez if he wanted "to explain it to him," and Jimenez told the informant to talk. 6-ER-1308. The informant responded, "[n]o, no, but I don't [U/I], in front of you, I don't want [U/I] anything;" and Jimenez said, "[i]t's okay, it's me and you." 6-ER-1308. The informant then told Calderon more about his plans for consecutive trips, every two to three weeks, and for Calderon to set the price and discuss it, apparently, with Jimenez, with whom the informant would be in touch. 6-ER-1308-12.

After Calderon left in his jeep, and Jimenez left in his Scion, agents surveilled Calderon while he drove around Redwood City. 3-ER-602-05; 4-ER-682. At one point aerial footage shows the Jeep and the informant's Camaro pull aside each other, with the drivers interacting. 4-ER-682-83. Calderon was stopped for vehicle violations in the driveway of an apartment building and fled. 3-ER-601-02; 4-ER-832-33, 852. Deputies searched the area and interacted with family members who came outside. 4-ER-833-34. A search of the Jeep found Calderon's ID card and a bag with a gun. 4-ER-833-47.

On September 18 or 19, Jimenez sent the informant a text, stating: "I gave my cousin your number. Everything is good with him." 3-ER-538. Calderon called the informant on September 19.[4] 3-ER-540; 6-ER-1322-23. He confirmed he was Jimenez's cousin and agreed to meet the informant the following Friday. 6-ER-1323-34. The informant suggested Redwood city, but Calderon said he couldn't go there, so they agreed on Palo Alto. 6-ER-1324-25.

The informant told Jimenez that Calderon had called him and asked why Calderon didn't want to meet in Redwood City. 6-ER-1328. Jimenez said the police are always looking for him. 4-ER-779-80; 6-ER-1329-30. The informant said, "[t]hen, let's do something. On Friday, If I'm going to meet with him, I'd like you to come with him also, so the three of us can talk….[¶] Please, because I'm telling you, I trust you, the same way that you trust me." 6-ER-1330.

The next meeting between the three occurred at the Home Depot parking lot in East Palo Alto on September 21, 2018. 3-ER-543-44, 606-07. Jimenez arrived first and waited with the informant, who asked Jimenez about his prior experiences with Calderon:

---

[4] Agents recognized Calderon's voice on the call. 3-ER-540-41.

C/I: Do you think that guy would get that for you, because I'd like to do it Tuesday?

Jimenez: Yes, yes, they have it....

C/I: Now the quality, it must be good quality.

Jimenez: They're good, they're good.

C/I: Because you've always told me now, and I really appreciate that, you've always worked professionally … It's not that good. You have told me up front….

If this guy comes, and he's going to tell me, and he's going to tell you that, and he's not going to bring us of the same one, then is when we're going to have a problem.

Jimenez: No, no, they've been having a good product. Like I was telling you, is going to be good.

C/I: Have you been working with him, how have you done it with him?

Jimenez: I get work from him as well.

C/I: And he gives it to you like that?

Jimenez: Yeah.

C/I: I'm telling you; I'm going to say it in front of him when he comes also. I'd like to do it only with you. At least the first time.

Jimenez: Now they're doing the same, damn, the same thing, is not that much.

C/I: No, we're not going to do it today. We're going to talk to see if we're going to do it.

Jimenez: Okay, do you want to talk to him? My phone is there so that you can call him….

C/I: Or he comes, and we talk. It's better so that he can see me. I feel comfortable with you always, and for him to see me face to face.

Jimenez: Well, that's fine. He's going to be in good terms with me, better.

C/I: And of course, of course, I know how important is to be cordial. And for him not to feel that he's being cut off the deal. But I mean, he can give it to you, we can do it at least for the first time, I'd see that everything went fine, and that he's involved. I have complete trust on you…. If you come, I'm going to feel much better. It's going to be done in a jiffy, and then two weeks later –

Jimenez: But look, this is the thing. If you're going to work, it's good for you to meet him.

C/I: Oh, yes, that is why I want you to come.

6-ER-1341-43;[5] 4-ER-786-87,791 (only reading where informant asked if they had been working, and Jimenez indicated he "got work from him as well").

Calderon arrived in a black BMW. 3-ER-607. He told the informant, "[i]f something comes bad, I'll be in charge of changing them for you." 4-ER-790. When the informant asked if they were "on the same price," Calderon said "47. Are you going to need 10?" And the informant stated he was bringing "for 15." 4-ER-790.

---

[5] Agent Villalobos wrote some edits into the translations. 4-ER-784.

On September 24, Calderon called the informant to see if he could go to him to talk that night or the next morning. 6-ER-1355. The informant said he couldn't meet then, but he was ready with the cash. 6-ER-1355-56.

> Calderon: It's seventy, and a half?
>
> C/I: Yes.
>
> …
>
> Calderon: Perfect. Yes. Don't worry. We're one hundred percent ready too. It's just a matter of us agreeing.
>
> C/I: Okay. What I want to know too is … that it's good quality, right?
>
> Calderon: Everything is – yes, …. if you get something bad, or something, I guarantee you, and I give you my word that I'm going to exchange everything for you. Whatever you don't like.

6-ER-1356-57; 4-ER-794-95. D.E.A. Agent Wolf opined sellers sometimes guarantee their products to build loyalty. 5-ER-1032.

D.E.A. agents lowered the agreed amount to 12 kilograms and planned to have the buy/bust operation on September 25. 3-ER-545-48; 4-ER-827-28. In his report of a pre-operation briefing, Sergeant Sabel wrote that the agents had been advised there was a "very strong possibility of a money rip." 3-ER-580-81.

Jimenez met the informant in the parking lot of the El Rancho Market in Menlo Park around 11:35 a.m. on September 25. 3-ER-644-45; 5-ER-947. An undercover agent performed a money flash from an SUV. 5-ER-948. Calderon arrived at noon in a silver BMW X5, and the three spoke together outside of the informant's Camaro. 3-ER-645-46. According to Agent Li, Calderon said he would need to go get the drugs and left. 3-ER-550. After first returning to his Camaro, the informant stood behind Jimenez's Scion before Jimenez got in and left. 5-ER-951-53.

> Later that afternoon, Jimenez called the informant:
>
> C/I: Okay, have you talked to him or not yet?
>
> Jimenez: I just talked to him right now, he said they were coming over here, right?…
>
> C/I: Okay, … he said that---that he is bringing it, do you think it's true or a lie?"
>
> Jimenez: Well, if they say he is bringing it, well, I say he is bringing it, right? ...
>
> C/I: I don't know, you know him better, not me.
>
> Jimenez: Well, yes, … why would they lie?
>
> C/I: Okay, do me a favor. … I'm thinking, if you can bring me one of the ones you have, so I can take it and test it good? …. [B]ecause maybe I can ... buy the rest from you in a few days.…

Jimenez: Okay.

6-ER-1361-62.

Arial surveillance followed Jimenez, who eventually pulled up to 223 Daphne Way in East Palo Alto. 5-ER-954. He walked up to the house carrying something white in each hand. Ex. 97-1, 12:18.[6]  He then left the house and was hidden from aerial view for about 30 seconds, before walking to his car with something larger in his right hand. Ex. 97-1, 12:20:17-12:21:20. He then stopped at a McDonald's, where a man identified as Jimenez's source, Farias, got into his car for several minutes. 3-ER-588; 5-ER-991-92; Ex. 97-1, 12:26-34.[7] Jimenez returned to the parking lot at 812 Willow and met with the informant for about 25 minutes, before returning to 223 Daphne. 5-ER-957-60; Ex. 97-1, 12:42-1:08-1:18.

The agent who was aerially surveilling Jimenez began surveilling Calderon's BMW at 2:23 p.m., following him around San Jose and East Palo Alto. 5-ER-962. At 2:41 p.m., Calderon stopped at

_____

[6] Appellant is concurrently moving to transmit the video exhibits cited herein. Citations are to the clock in the upper-left corner of the video.

[7] Farias was charged in a separate earlier conspiracy in Count 1, along with Jimenez, but not Calderon. 6-ER-1398-99.

a gas station and left with two people. 5-ER-986. A man exited at a homeless encampment before being picked back up by the BMW. 5-ER-987. This repeated at a mobile home park. 5-ER-987. The BMW also stopped at Jack in the Box. 5-ER-987-88. After that, the man exited at another encampment, and a woman exited at an apartment complex, carrying several bags. 5-ER-964, 988.

At 4:21 p.m., the BMW parked near 223 Daphne. 5-ER-965. Jimenez's Scion is not there. Ex. 97-2, 16:21:44-47. The video stops and the next disc starts 42 seconds later, showing Calderon walking along the side of 223 Daphne near some parked cars, including a red Mustang, in non-working condition. 3-ER-422; 5-ER-965-66; Ex. 97-3, 16:22:32. Agent Brown interpreted the video as showing Calderon approaching the Mustang, opening the driver door, and placing a white object he was carrying inside it, closing the door, and then walking back toward the driveway. 5-ER-967-98. However, given trees and shadowing, it is hard to see any details except Calderon's approaching a trash can, holding something white, and briefly pausing next to the Mustang, before walking back down the driveway without anything in his hands. Ex. 97-3, 16:22:32-55. When Calderon

next appears in view of the orbiting plane's camera thirty seconds later, he can be seen walking towards the front of the house empty-handed, and then turning around and walking to the backyard where he is hidden by the bushes and trees for a minute and a half, before walking back down the driveway and returning to his car while slightly adjusting his pants. 5-ER-968-69; Ex. 97-3, 16:23:31-16:25:55. Calderon then drove around for a half-hour before returning to 812 Willow and briefly meeting with Jimenez and the informant. 5-ER-974-75; Ex. 97-3, 16:25:55-16:54:30.

Calderon then drove around again before picking up a passenger who had exited a white car stopped at the same light. 5-ER-976-77; Ex. 97-3,17:15:20-17:15:30. The white car followed Calderon back to 812 Willow and immediately parked near Jimenez and the informant's cars. 5-ER-978; Ex. 97-3, 17:21:20-17:22:14. Calderon drove around the side and parked closer to where Jimenez and the informant stood after exiting the market. 3-ER-649-50; 5-ER-978; Ex. 97-3, 17:22:14-17:22:40. The passenger exited Calderon's car and greeted them, followed by Calderon. 4-ER-658, 5-ER-979; Ex.97-3, 17:22:42-17:23:23. While they were talking, the white car pulled up

behind them. 5-ER-979; Ex. 97-3, 17:23-23. Agents arrived, and Calderon fled and was arrested nearby. 3-ER-599; 5-ER-980.

Following a K9 alert, Agent Tush searched Jimenez's Scion and found a kilo of methamphetamine inside a cardboard box. 4-ER-902-03; 5-ER-934. The only items found in Calderon's BMW were an iPhone, a scale with residue, unused sandwich bags, clothes, and toiletries. 4-ER-906-07.

At 223 Daphne Way, agents found numerous Ziploc bags containing methamphetamine inside a box, a trunk, a shaving kit bag, and a plastic container, plus bundles of money. 4-ER-861-72, 882-83; 5-ER-931-33 (stipulating net weight totaling 7,101 grams). A white plastic bag containing 335 net grams, with 317.2 grams of pure methamphetamine, was found in the Mustang parked in the driveway. 5-ER-933. DEA agents also found ID cards and DMV mail for Jimenez, and a court-related notice for Calderon. 5-ER-887-88; 6-ER-1397. There were also registration, insurance, and title documents showing Jimenez owned the Mustang. 4-ER-890-93.

## SUMMARY OF THE ARGUMENT

Mr. Calderon's four counts of conviction stem from two separate events, with separate grounds for reversal.

Counts 13 and 14 are premised on drugs and a gun found pursuant to a vehicle search that all parties have agreed was illegal. The district court denied Calderon's motion to suppress this evidence, by finding it inevitably would have been discovered once probable cause arose from a valid search of Calderon incident to his arrest for unrelated warrants. However, this rested on an erroneous presumption the officers had lawful custody of Calderon's truck and the authority to "release" it to his cousin when convenient to them.

The Fourth Amendment prohibits unlawful seizures as well as searches. Officer Carboni's preventing Calderon's cousin from taking a truck he was illegally searching was a *per se* unreasonable seizure, with no applicable exception. The Government failed to prove the truck inevitably would have been available to search once probable cause eventually arose, had Carboni not unlawfully seized it; and the court failed to hold the Government to its burden by neglecting to assess the legality of the seizure, as well as the searches.

Counts 8 is premised on an unconsummated drug deal, manufactured by the Government and mislabeled as a conspiracy. Specifically, the Government used an informant to get a known seller, Jimenez, to find someone else to sell the informant a large quantity of drugs and be present during their meetings, and then mislabeled that "business introduction," a "conspiracy." Ample precedent has established that drug conspiracies require evidence of an agreement to commit a crime beyond a single negotiated sale, with a shared stake therein. *See*, *e.g.*, *United States v. Ramirez*, 714 F.3d 1134, 1140 (9th Cir. 2013); *United States v. Loveland,* 825 F.3d 555, 562 (9th Cir. 2016). The record here was void of evidence that Calderon collaborated *with* Jimenez to provide drugs to the informant, or that they had any agreement beyond Calderon's single anticipated sale to the informant, or that Jimenez had any shared stake therein. Thus, there was insufficient evidence of an established element, requiring dismissal of Count 8.

This Circuit's model instructions provide this element of an agreement to commit a crime beyond that of the mere sale, citing this precedent and providing the instruction be given for all §846 drug

conspiracies. The district court plainly erred by failing to provide this instruction, where a properly-instructed jury could have found no such agreement had been proven.

The court additionally plainly erred by omitting the standard instruction that jurors must unanimously agree as to the particular crime the conspirators agreed to commit, and including extraneous information suggesting broader conspiracies than the one charged here. It also provided plainly-erroneous verdict forms for the possessions charged in Counts 10 and 13, by asking the jury to select the amount of methamphetamine they found Calderon *conspired* to distribute or possess, rather than what he actually possessed.

These instructional errors individually and cumulatively affected Calderon's constitutional rights to have the charged elements proven beyond a reasonable doubt by a unanimous verdict and the fairness and integrity of the proceedings.

Finally, trial counsel provided constitutionally-ineffective assistance by failing to argue the evidence did not establish the drug-conspiracy element of an agreement to commit a crime beyond his negotiated sale; failing to object to the instructions' omission of that

element and the specific-unanimity requirement; failing to object to the erroneous verdict forms; making an erroneous and harmful concession that evidence of a lesser quantity of methamphetamine found on Jimenez's property could support the charged conspiracy to possess with intent to distribute, if the jury found Calderon had placed it there; and failing to object to the provision of a timeline highlighting material facts, for the jury to keep in their notebooks.

The authority presented below in Parts I and II requires the dismissal of Counts 8, 13, and 14; and the authority presented in Parts III and IV requires the reversal of Counts 8 and 10.

## LEGAL ARGUMENT

### I. THE EVIDENCE SUPPORTING COUNTS 13 AND 14 SHOULD HAVE BEEN SUPPRESSED, BECAUSE IT WAS OBTAINED PURSUANT TO AN ILLEGAL SEARCH AND SEIZURE, IN VIOLATION OF THE FOURTH AMENDMENT.

#### A. Relevant Facts

At around 4:00 a.m. on August 20, 2018, San Jose State University Police Corporal Christopher Zonsious ran Calderon's license plate, after observing his truck stop in a bicycle lane and pull back out again, within a mile from campus. 2-ER-98-99, 143. The registration came back suspended, and he activated his patrol lights.

2-ER-99-101. Calderon stopped the truck in the down-sloped driveway of an apartment building's garage. 2-ER-101-02.

Zonsious checked Calderon's driver's license, which returned with a felony warrant for violating a domestic-violence protective order. 2-ER-111, 115-16. Calderon was on his phone when Zonsious removed him from the truck and handcuffed him. 2-ER-119; Ex. 1, Zonsious Bodycam Video, 11:05:30-50.[8] Calderon asked if his cousin, Cesar, could take the truck, and Zonsious responded, "yes, your cousin can take the truck." Ex. 1, 11:06:02; 2-ER-119. Calderon said Cesar was on his way, and Zonsious said "that's fine, I don't have a problem with your cousin taking the car." Ex. 1, 11:06:11-45.

Officer Edward Carboni took Calderon's keys and placed them on the truck's driver-side door panel. Ex. 2, Carboni Bodycam Video, 11:6:05-08. Carboni stated, "I'll take care of this," and began searching the truck. Ex. 1 & 2, 11:06:40-56. Calderon started to say he wanted "to see everything you guys, you know," and Zonsious reassured him, "we're not taking anything out of your vehicle" and

---

[8] Appellant is concurrently moving to transmit these exhibits from the evidentiary hearing. He cites to the universal time clock in the videos' upper-right corner, which is 7 hours ahead of the local time.

walked Calderon up to the squad car. Ex. 1 & 3, Krapivkin Bodycam

Video, 11:6:45-49. Meanwhile, Carboni lifted up a seat cushion,

opened the console, picked up some cell phones and turned them on,

opened Calderon's wallet, and pulled a backpack from the backseat

area. Ex. 2, 11:06:40-7:52.

Cesar arrived near the squad car, where Zonsious was

preparing to search Calderon incident to his arrest. Ex. 3, 11:07:30.

Calderon stated Cesar had a valid license, and Zonsious told Cesar,

"you can take possession of the vehicle, he has given you permission

to do that." Exh 1&3, 11:07:36-44. Cesar asked Carboni, "why are you

going through his truck?" Ex. 1&3, 11:07:50. Carboni responded:

> Because he's under arrest, okay? If you would like to take
> possession of the truck, you can wait over by the tree,
> okay? But what you're not going to do is just come in here
> and start asking questions, okay? So after we are done
> with the truck you can take possession of it."

Ex. 2&3, 11:07:55-8:07. Carboni resumed searching the truck, and

Zonsius began searching Calderon. Ex. 1&2, 11:08:10-20.

While Caboni was telling Cesar to wait, Calderon asked

Zonsious if Cesar could "grab his money and everything." Ex. 1,3,

11:8:04. Zonsious responded, "yes he can," and Calderon said "hey

Cesar," but Zonsious stopped him and said, "just hold up for a second, we got to deal with this for a second, and we'll get to that in a second." Ex. 1&3, 11:08:04-12 (Officer Krapivkin also saying "we'll give it all to him, ok, but right now we're going to....") Caldron asked if Cesar could take "all my things," and Krapivkin said Calderon could leave whatever he wanted with Cesar, but "we just got to get through this whole thing first." Ex. 1&3, 11:08:12-33.

Back at the truck, Carboni unzipped the backpack and pulled out a bag containing suspected methamphetamine.[9] Ex. 2, 11:08:30; 2-ER-197. He walked up to where Zonsious was searching Calderon and falsely stated, "[y]ou're going to have some on-view charges as well." Ex. 2, 11:08:34-45. Carboni told Calderon, "the truck is no longer going with your brother (sic)." Ex. 2, 11:8:45. Carboni told Cesar he "could go back inside; we're not giving the truck back to you." Ex. 2, 11:9:10-13. Carboni resumed searching the truck. Ex. 2, 11:09:40.

By 4:09:30 a.m., Zonsius had found a large amount of cash and

---

[9] At trial, the parties stipulated it contained 706 grams of methamphetamine. 5-ER-930.

six bullets in Calderon's pockets. Ex. 1&3. 11:08:15-09:30; 2-ER-124-26. He placed Calderon in his squad car and spoke with Carboni at the truck, telling him to "just stop." Ex. 1&2, 11:10:00-19. Carboni showed Zonsious the methamphetamine, saying "you've at least got him for sales." Ex. 1&2, 1l:10:20-36. Zonsious checked his computer again, and in response to another officer, stated "no, he's gone … keep him gone." Ex.1, 11:11:02-11:14. Zonsious returned to the truck saying, "there's going to be a gun in here too, I found bullets." Ex.1, 11:11:20-11:25. While Zonsius and Carboni searched the truck, Zonsius said:

> Ok, we're towing the car because we're placing him under arrest at this time for the felony. Ok. So, we're doing the inventory search. Let's just double check everything —
>
> Carboni: Well, in addition to having the felony warrant that's why I'm searching where he has access to … [w]hich is what led me to this [methamphetamine], which was sitting on the top.

1-ER-58; Ex. 1&2, 11:11:46-12:07.

Carboni found a gun wedged in the driver's side of the truck, while Zonsius found an ammunition magazine in a bag on the front passenger's seat. Ex. 1&2, 11:12:22. A few minutes later, Carboni found a second bag containing additional methamphetamine. Ex.1&2,

11:11:02-11:25; 2-ER-210. The keys remained in the truck on the inside of the door during the search, until Carboni moved them to the driver seat while leaving with the evidence. Ex. 2, 11:6:05-08, 11:17:40; 2-ER-213.

Calderon moved to suppress this evidence, as obtained pursuant to an illegal search and seizure of his truck and its containers, in violation of the Fourth Amendment. Dkt. #78. The Government conceded the initial search of the truck by Officer Carboni was illegal; but argued the evidence inevitably would have been discovered pursuant to a lawful search once Zonsious found bullets on Calderon's person and had probable cause to search the truck for a gun, because domestic-violence restraining orders typically prohibit possession of guns or ammunition. 1-ER-59; 2-ER-116-17; Dkt. #97 at 10, 13-14. Following an evidentiary hearing, the district court agreed the officers inevitably would have searched the truck, and it denied the motion. 1-ER-63. Calderon was convicted of Counts 13 and 14, which were premised on evidence obtained from the truck. 1-ER-11-15.

## B. Legal Standards

"Searches and seizures that offend the Fourth Amendment are unlawful[,] and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." *United States v. McClendon,* 713 F.3d 1211, 1215 (9th Cir.2013) (citing *Wong Sun v. United States,* 371 U.S. 471, 484-87 (1963)). Nevertheless, such illegally-obtained evidence may be admitted "[i]f the prosecution can establish by a preponderance of the evidence that [it] ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444 (1984). A district court must "'examine *each of the contingencies* that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally'" and have a "*high level of confidence*" the evidence would have been lawfully obtained before denying a suppression motion. *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006) (quoting *United States v. Lavan*, 10 F.Supp.2d 377, 389 (S.D.N.Y.1998)). "[I]nevitable discovery involves no speculative

elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444, n.5.

This Court reviews the district court's rulings on motions to suppress de novo, *United States v. Anderson*, 56 F.4th 748, 755 (9th Cir. 2022), and its factual findings, including inevitable discovery, for clear error, *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000).

## C. The Government Did Not Establish Calderon's Truck Inevitably Would Have Been Available to Lawfully Search, Absent Officer Carboni's Illegal Search and Seizure.

The district court found Zonsious would not have released the truck to Cesar before finishing his lawful search of Calderon and inevitably would have searched the truck after finding bullets on him that established probable cause to search for a weapon. 1-ER-60-61. These findings failed to consider the impact of Officer Carboni's illegal conduct in preventing Cesar from taking the truck, while erroneously presuming Zonsious's authority to *release* a truck that was being unlawfully *seized*.

Specifically, the only one preventing Cesar from taking the truck after Zonsious told him he could was Carboni, who told Cesar to wait until he was done searching it pursuant to Calderon's arrest.

Everyone agrees that search was illegal, as the truck was not within Calderon's reach. *See Arizona v. Gant*, 556 U.S. 332, 343 (2009); 1-ER-59; Dkt. #97 at 10. What was not addressed was the illegality of Carboni's *detaining the truck* pursuant to that search. *See United States v. Place*, 462 U.S. 696, 700-02 (1983).

The Fourth Amendment protects property from unreasonable seizures. "A seizure results if 'there is some meaningful interference with an individual's possessory interests in that property,'" including vehicles. *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) (quoting *Soldal v. Cook County*, 506 U.S. 56, 61 (1992)). A warrantless seizure is *per se* unreasonable absent a recognized exception, such as community caretaking or exigent circumstances with reasonable suspicion. *Id.*; *Place*, 462 U.S. at 700-02.

Unsurprisingly, maintaining custody of arrestees' vehicles is not part of these university police officers' standard procedures, and they articulated no valid grounds for preventing Cesar from taking custody of the truck before suspicion arose to search it. *See* 2-ER-150-51; *United States v. Hellman*, 556 F.2d 442, 444 (9th Cir. 1977) (finding inventory search unreasonable where "not shown to be a

routine practice and policy of this police department"); *United States v. Ruckes*, 586 F.3d 713, 719 (9th Cir. 2009) (finding inventory search "would have necessarily followed" pursuant to "standard procedure" of impounding car left on highway pursuant to driver's arrest with no one available to take it). Neither Calderon's arrest, nor a community-caretaking exception, would justify this "'meaningful interference'" with his property, where another driver was available and it was not "'impeding traffic or threatening public safety and convenience.'" *Miranda*, 429 F.3d at 862 (quoting *Soldal*, 506 U.S. at 61; *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)); *see also United States v. Cervantes*, 703 F.3d 1135, 1141-42 (9th Cir. 2012) (impoundment unjustified where parked on residential street); *United States v. Turnbow*, No. 18-00001, 2019 WL 654456, **6-7 (D. Nev. 2019), aff'd, 812 F. App'x 632 (9th Cir. 2020) (citing officers' ability to leave car with passenger in finding pretextual inventory search violated Fourth Amendment); *compare Anderson*, 56 F.4th at 759 (approving impoundment where arrestee parked in unwilling homeowner's driveway and no one else available to move truck).

The Government has not proven Cesar could not have removed

the truck or its containers before Zonsious found the bullets, absent Carboni's wrongfully preventing him from doing so. *See United States v. Lundin*, 47 F. Supp. 3d 1003, 1021-22 (N.D. Cal. 2014) (citing *United States v. Young*, 573 F.3d 711, 723 (9th Cir. 2009)) (no inevitable discovery where others could have moved contraband before lawful search). The keys remained accessible on the truck's door after Carboni took them from Calderon. Carboni's telling Cesar to wait while he illegally searched the car and then to leave after he illegally unzipped the backpack and found the methamphetamine were not "inevitable step[s under] routine procedures." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1400 (9th Cir. 1989).

Zonsious's post-hoc explanation that he would not have released the truck to Cesar until he finished searching Calderon is not sufficiently attenuated from Carboni's unlawful conduct to render the discovery inevitable. 2-ER-120. Zonsious's initial assurances that Cesar could take the truck were unconditional. It was only *while* Carboni was telling Cesar he had to wait for him to finish his illegal search, and Calderon asked Zonsious mid-search if Cesar could take his *money* and called out for Cesar, that Zonsious indicated they had

"to deal with this for a second, and we'll get to that in a second." Ex. 1&2, 11:08:05-12. Regardless of whether Zonsious might have lawfully prevented Calderon from giving Cesar the money he had removed from his pockets while still searching him; neither he nor Carboni could lawfully prevent Cesar from taking the truck and its containers without articulating reasonable suspicion and exigent circumstances for detaining it. *See Place*, 462 U.S. at 700-02. Tellingly, Zonsius testified it would have been "unsafe" to release the truck to Cesar "before [he] completed the search of Mr. Calderon's person" because, "in hindsight he would have been getting the vehicle with a gun in it." 2-ER-163; *cf. United States v. Jones*, 72 F.3d 1324, 1334 (1995) ("It is all too easy to imagine in retrospect lawful avenues through which the government might have obtained evidence that in reality it came upon in contravention of the Fourth Amendment.")

Thus, the historical facts demonstrate both Zonsious and Cesar were influenced by Carboni's unlawful conduct in searching the truck and seizing it and its containers without probable cause or reasonable suspicion. The court's focusing on whether Zonsious would have released it before he had finished searching Calderon misses the

point. The truck was not in his or Carboni's custody; therefore, they had no authority to prevent Cesar from taking it.

Additionally, the court's determination that Zonsious inevitably would have lawfully searched the truck after finding bullets is undermined by its sidestepping the fact that neither officer articulated probable cause at the time they were searching it. Carboni falsely indicated he was searching "where [Calderon] has access to incident to his arrest," despite Calderon's being in custody far from the truck, and that the methamphetamine was "on view," when he had found it inside a zipped-shut backpack he had pulled from the backseat area. Ex. 2, 11:08:30-45; 11:11:46-12:07. Zonsious indicated they were doing an "inventory search," "because we're placing him under arrest at this time for the felony." Ex. 1, 11:11:46-12:07. Zonsious's post-hoc assurances that he inevitably would have searched Calderon's truck pursuant to probable cause for an additional crime to the one permitting arrest is insufficient to establish he inevitably would have done so, *absent* Carboni's illegal conduct in preventing Cesar from taking the truck and preemptively searching it; and their disingenuous statements of unlawful grounds

demonstrate pretext. *See* 2-ER-163; *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017) ("in order to prove that a [seizure] is unreasonably pretextual, a defendant must show that [it] would not have occurred in the absence of an impermissible reason"); *Florida v. Wells*, 495 U.S. 1, 4 (1990) ("Our view that standardized criteria … or established routine … must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.")

Therefore, the court clearly erred in presuming the officers could refuse to "release" a vehicle they had no legal grounds to seize and overlooking how Carboni's illegal conduct prevented Cesar from moving it before Zonsious found the bullets. *See* 1-ER-60-63; *Miranda*, 429 F.3d at 862. It further erred by failing to address whether the post-hoc probable-cause search of the truck and its containers was pretextual. *See* 1-ER-60-63; *Orozco*, 858 F.3d at 1213. The court failed to hold the Government to its burden of proof. *See Jones*, 72 F.3d at 1334 ("if [the exception] is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts

must take care to hold the government to its burden of proof.") Its order denying Calderon's motion to suppress and Counts 13 and 14, premised on the unlawfully-obtained evidence, must be reversed.

## II.  THERE WAS INSUFFICIENT EVIDENCE OF THE CHARGED CONSPIRACY.

### A. Standard of Review

The Due-Process clauses of the Fifth and Fourteenth Amendments guarantee the right to have each element of a criminal conviction proven by sufficient evidence. *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993); *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). This Court performs "a two-step analysis" in reviewing a claim that insufficient evidence supported a criminal conviction. *United States v. Mendoza*, 25 F.4th 730, 735-36 (9th Cir. 2022). First, it considers "'the evidence presented at trial in the light most favorable to the prosecution,'" by making "'reasonable inference[s]' in the prosecution's favor," which are not based on "'mere speculation.'" *Id.*, quoting *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc). Second, it "must determine whether the evidence, including any 'evidence of innocence' or 'lack of evidence of guilt,' 'could allow any

rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 736 (quoting *Nevils*, 598 F.3d at 1164-65).

This analysis is essentially the same for plain-error review of an unpreserved insufficient-evidence claim. *See United States v. Matthews*, 849 Fed. Appx. 668, 670 & fn.2 (9th Cir. 2021) (any difference between *de novo* and plain-error review of an unpreserved insufficient-evidence claim is "'largely academic,'" because both standards require "'great deference to the jury's verdict'") (quoting *United States v. Pelisamen*, 641 F.3d 399, 409 n.6 (9th Cir. 2011)).

## B. The Charged Conspiracy Requires Proof of Calderon's Agreement with Jimenez to Advance Further Distribution, with their Shared Stake in the Venture.

Calderon was charged in Count 8 with conspiring with Jimenez to distribute and possess with intent to distribute 500 or more grams of methamphetamine. 6-ER-1401. To obtain this conviction, the Government had to prove beyond a reasonable doubt that Calderon "'knowingly and intentionally' joined in an agreement with [Jimenez] to commit an unlawful act." *United States v. Bey*, 725 F.3d 643, 649 (7th Cir. 2013).

However, proof of an agreement to sell at least 500 grams of

methamphetamine is insufficient to prove the charged conspiracy. "[T]o attach the title of conspirator, there must be something else happening in the marketplace besides merely buying and selling some illegal drug. There must be an agreement between two or more parties to commit a crime distinct from the sale itself." *United States v. Pulgar*, 789 F.3d 807, 808 (7th Cir. 2015). "Evidence of an agreement to advance further distribution—beyond the initial transaction—is therefore required." *Id*. at 812-13; *see also Mendoza*, 25 F.4th at 736; *United States v. Loveland,* 825 F.3d 555, 562 (9th Cir. 2016) ("A relationship of mere seller and buyer, with the seller having no stake in what the buyer does with the goods, shows the absence of a conspiracy, because it is missing the element of an agreement for redistribution.")

Mere knowledge that a buyer would redistribute drugs is also insufficient. *United States v. Ramirez*, 714 F.3d 1134, 1140 (9th Cir. 2013). "[A] co-conspirator has 'a stake in the venture' and therefore exhibits 'informed and interested cooperation.'" *United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943)).

Furthermore, "when a government agent … is involved in the transaction, a conspiracy conviction requires proof that the defendant conspired with someone other than the government agent." *Bey*, 725 F.3d at 649.

Thus, the Government had to prove Calderon entered into an agreement *with* Jimenez to advance further distribution, with a shared stake in the venture.

> In a case, like this one, in which a government informant brings a middleman to the deal, we must make sure that there is an evidentiary basis for the jury to conclude beyond a reasonable doubt that the middleman had an agreement with the seller to distribute drugs in addition to the agreement to help the informant buy drugs. It is important to pay attention to the role played by each participant in the transaction so as not to turn the conspiracy offense into "a simple substitute for a drug distribution conviction."

*Bey*, 725 F.3d at 649-50 (quoting *United States v. Rivera,* 273 F.3d 751, 756 (7th Cir.2001)).

*Bey* and *Ramirez* demonstrate the parameters of where government agents' use of civilian middlemen to purchase drugs from other civilians might qualify as conspiracies. In *Ramirez*, on four occasions, the agent handed a middleman money to buy drugs from Ramirez, which the middleman then handed to the agent. 714 F.3d at

47

1136. Explaining it was looking for "evidence of a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture," the Ninth Circuit reversed because there was no evidence Ramirez "had any kind of involvement in [the middleman's] drug sales." *Id.* at 1140.

In *Bey*, a government agent, Chub, asked Bey if he knew anyone selling good heroin, and Bey suggested Hemphill and would find out the price. 725 F.3d at 647. A few weeks later, Chub asked Bey to "'take care of everything,'" and he would give him $1000 for helping to arrange the deal. *Id.* Chub drove Bey to Hemphill's work, where Hemphill sold heroine to Chub and paid Bey a finder's fee. *Id.*

In evaluating whether "the middle-man had an agreement with the seller to distribute drugs in addition to the agreement to help the informant buy drugs," *Bey* cited evidence that "the middleman had a clear stake in the seller's sales" as "typically sufficient" to distinguish a conspiracy from a buyer-seller relationship and provided the "clearest evidence" supporting Bey's conviction. *Id.* at 649-50.

Thus, the key factor allowing a conspiracy in *Bey*, which was absent in *Ramirez*, was a shared stake in the sales. *See also Direct*

*Sales*, 319 U.S. at 713 (describing profitable "stake in the venture" as marking "the shadowy border between lawful co-operation and criminal association or the no less elusive line which separates conspiracy from overlapping forms of criminal cooperation"). Applying these cases' analysis here, there was insufficient evidence that Calderon and Jimenez conspired to distribute 500 grams of methamphetamine.

### C. The Government Failed to Prove Calderon Conspired with Jimenez.

The Government failed to produce any evidence of the requisite agreement for redistribution, with a "shared stake" and "informed and interested cooperation," between Jimenez and Calderon. *Direct Sales*, 319 U.S. at 713; *Loveland,* 825 F.3d at 562.

Its evidence indicates Jimenez functioned first as the informant's dealer for some uncharged transactions and then as a sort of buyer's agent to locate a larger-scale seller than himself. *See*, *e.g.*, 3-ER-593-96; 6-ER-1277-83. There was no evidence of Calderon's involvement in Jimenez's direct sales, which apparently involved different co-conspirators. *See* 3-ER-591-93; 6-ER-1398-99. And, there was no evidence Jimenez had any stake in the single deal he

attempted to broker at the informant's request, nor in any

downstream distributions resulting from that deal. *Compare Bey*, 725

F.3d at 649-50.

Importantly, there was no evidence Calderon entered into an

agreement *with* Jimenez to distribute (or possesses with intent to

distribute) 500 grams of methamphetamine, as opposed to merely

assenting to his solicitation to sell to the informant.[10] *See United*

*States v. Contreras,* 249 F.3d 595, 599-600 (7th Cir. 2001)

(distinguishing evidence middleman "aided and abetted" sale from

"prolonged cooperation" or "stake in the success of Contreras'

trafficking—the type of evidence that usually signals a conspiratorial

relationship"). The only evidence cited by the prosecutor to establish

an agreement was Jimenez's texting the informant: "A friend will give

them to you at 4,700 if you get five or more." *See* 3-ER-532; 5-ER-

1075, 1140, 1150 (prosecutor stating text was circumstantial evidence

---

[10] Because conspiracy is an inchoate offense, the evidence required for conspiracy to distribute and conspiracy to possess with intent to distribute is not meaningfully distinct. *See* Part IV.B.4. Regardless, there is no non-speculative evidence that Jimenez and Calderon had any shared intention to possess 500 grams of methamphetamine for distribution.

"of a conspiracy, of the agreement," *i.e.*, "this business introduction made by Jimenez of Calderon to the informant"), 1195-96 ("Jimenez was referring business to Calderon").

A business introduction is not a conspiracy. *United States v. Tyler*, 758 F.2d 66, 69 (2d Cir. 1985) (helping willing buyer find willing seller is insufficient to establish conspiratorial agreement between facilitator and seller). The record is void of any evidence that either the putative buyer or seller planned to compensate Jimenez for his role, which rendered the seller's conspiracy conviction invalid in *Ramirez*, 714 F.3d at 1140, and was the determinative, though underwhelming, factor in *Bey*, 725 F.3d at 649. And yet, in *Ramirez*, the Government's case was stronger, as the middleman had facilitated four completed transactions between Ramirez and the government agent, directly handing over the drugs and money each time. 714 F.3d at 1136; *see Loveland*, 825 F.3d at 560-61.

Here, all Jimenez was shown to do was locate a seller and quote a price, and then attend their meetings, all at the informant's request. The informant explained he wanted Jimenez there *for the first time*, because he had "complete trust on you. … If you come, I'm

going to feel much better." 6-ER-1342 (Jimenez replying: "If you're going to work, it's good for you to meet him"); *see also* 3-ER-597 (Agent Li stating, "[w]e specifically wanted Eric Jimenez to be there for the transaction"). Jimenez had given Calderon the informant's number, which he used to make the arrangements; Calderon never indicated he needed or wanted Jimenez to facilitate the transaction. 3-ER-538-39; 6-ER-1328, 1355. In short, Jimenez agreed to help the informant find a seller of 10-15 kilos, and Calderon ostensibly agreed to sell to the informant, but there is no evidence Jimenez agreed *with Calderon* to work *together* to sell it.

Indeed, when it looked like Calderon might not come through, Jimenez acceded to the informant's request to bring a kilo of his poor-quality methamphetamine and met up with his source and co-conspirator from Count 1, Farias. 3-ER-588; 5-ER-957, 992; 6-ER-1361-62, 1398-99. Thus, if anything, the evidence indicated Jimenez personally had something to gain if Calderon's sale fell through, by unloading his low-quality stash. It failed to show any direct collaboration between Calderon and Jimenez to supply that or the

large-scale, high-quality, methamphetamine the informant sought.[11]

Nor does Calderon's brief stop outside Jimenez's house, or his court document inside it, provide non-speculative evidence of the charged conspiracy. *See* Ex. 97-3, 16:22:32-55. Assuming, *arguendo*, the 335 grams found in Jimenez's Mustang could be attributed to Calderon based on the spotty aerial surveillance, that is less than the 500 grams he was charged with conspiring to possess for distribution, and there is no evidence of any communications with Jimenez regarding his stop there. It would require impermissible speculation to find Jimenez knew about that drop (if Calderon did it) and that they had any particular joint plans for further distributing it. *Direct Sales*, 319 U.S. at 711 ("charges of conspiracy are not to be made out

---

[11] Jimenez's assurance to that he had previously obtained good-quality "work" from Calderon also does not establish their conspiratorial relationship. 6-ER-1342. Agent Wolf opined that receiving "work" here meant getting drugs. 5-ER-1044. No evidence was presented to show whether that was for personal use or resale, or whether Calderon had any knowledge of or stake in Jimenez's downstream use of those drugs, or even *when* those transactions occurred, in relation to the charged conspiracy timeline. Wolf also interpreted Jimenez's stating, "I have another one," as referencing a different seller than the one who had been supplying Jimenez's drugs, whom Agent Li had identified as Farias. 3-ER-588; 5-ER-1036-36; 6-ER-1279. In any case, even repeat sales are insufficient, standing alone, to establish conspiracy. *See Contreras,* 249 F.3d at 600.

by piling inference upon inference, thus fashioning … a dragnet to draw in all substantive crimes"); *cf. United States v. Gill*, 650 Fed. Appx. 420, 422 (9th Cir. 2016) ("no evidence of an agreement to distribute jointly or in parallel," where "Gill and Erickson, who sold separately, bought dealer-sized quantities of methamphetamine together once and discussed doing so another time; and … Erickson lived in Gill's house for a few days.") There is simply no rational connection between Calderon's leaving 335 grams behind at Daphne Street and his planned sale of 12-15 kilos to the informant, to which Jimenez arrived with his own kilo (at the informant's separate request) and Calderon arrived empty handed.

The evidence highlighted by the prosecutor only showed Calderon agreed to sell methamphetamine to the informant; not that he agreed to do it *with* Jimenez, nor knowingly joined Jimenez's prior conspiracy to sell methamphetamine to the informant. *See* 5-ER-1142-43 (citing text message, Sept. 11 meeting, and phone calls with informant); *Iannelli v. United States*, 420 U.S. 770, 777, n.10 (1975) (emphasis added) ("In some cases reliance on [circumstantial] evidence perhaps has tended to obscure the basic fact that

the agreement is the essential evil at which the crime of conspiracy is directed.") Tellingly, other than that text message, the Government presented zero communications between Calderon and Jimenez outside of the informant's presence, despite their possession of multiple cell-phones. 3-ER-493; 4-ER-907. Beyond quick greetings, Calderon communicated exclusively with the informant, took Jimenez's place inside the informant's Camaro, and presented what he, alone, could provide to him, with no suggestion of Jimenez's involvement. 4-ER-679-81; 6-ER-1306-12.

The totality of this evidence is insufficient to show Jimenez had the requisite stake and collaboration, or "concert of action," in Calderon's anticipated sale to the informant to prove Calderon entered into an agreement to distribute methamphetamine with him. *Direct Sales*, 319 U.S. at 709, 713. Likewise, evidence that Calderon understood the informant planned to further distribute the drugs and he wanted the informant to be a satisfied returning customer was insufficient to prove conspiracy, because mere knowledge of the buyer's plans is insufficient and the putative buyer here is a government agent. *See*, *e.g.*, *id.* at 709 ("one does not become a party

to a conspiracy by aiding and abetting it ... and the inference of [conspiracy] cannot be drawn merely from knowledge that the buyer will use the goods illegally"); *United States v. Thomas*, 284 F.3d 746, 754 (7th Cir. 2002) ("effort[s] to cultivate Jones as a customer ... do not reflect ... a shared stake in the success of Jones' distribution enterprise"); *Bey*, 725 F.3d at 649.

In the end, the Government presented evidence of a single unconsummated drug deal between a lone seller and a government agent. The evidence may establish solicitation on the part of Jimenez and attempted sales by both Calderon and Jimenez, with Jimenez as an aider and abettor to Calderon's attempt or with his own attempted direct sale to the informant. *See Contreras,* 249 F.3d at 599-600. But the evidence fails to prove they *conspired* to sell at least 500 grams of methamphetamine, and thus Calderon's conviction in Count 8 must be dismissed.[12]

_____

[12] For these reasons, the Government's motion in limine to admit Jimenez's hearsay statements should have been denied, as it failed to prove by a preponderance of the evidence that "there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (quoting Fed. R. Evid. 801(d)(2)(E)).

### III. THE JURY RECEIVED PLAINLY-ERRONEOUS INSTRUCTIONS AND VERDICT FORMS.

### A. Standard of Review

This Court reviews de novo whether a jury instruction misstates the law or a crime's elements. *United States v. Rodriguez*, 971 F.3d 1005, 1012 (9th Cir. 2020); *United States v. Gergen*, 172 F.3d 719, 724 (9th Cir. 1999). It reviews the "'language and formulation' of a jury instruction for abuse of discretion." *Rodriguez*, 971 F.3d at 1012.

Where, as here, a defendant failed to object at trial to jury instructions challenged on appeal, this Court reviews for plain error. *United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000). "A trial court commits plain error when (1) there is error, (2) that is plain, and (3) the error affects substantial rights." *Id.* at 962. "In order to reverse a conviction for plain error, the court of appeals must determine, in its discretion, that the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Mims*, 92 F.3d 461, 465-66 (7th Cir. 1996) (quoting *United States v. Olano*, 507 U.S. 725, 732-36.)

**B. The Omission of the Drug-Conspiracy Element of an Agreement to Commit a Further Crime, with a Shared Stake therein, Was Plain Error, which Violated Calderon's Substantial Rights.**

### 1. Relevant Instructions

The district court's instructions for Count 8 track much of the shared language of Ninth Circuit Model Instructions 11.1 (Conspiracy—Elements) and 12.5 (Controlled Substance—Conspiracy to Distribute or Manufacture (21 U.S.C. §§ 841(a), 846)), while omitting their specific-unanimity requirement and including additional language suggesting a wider conspiracy, *see* Part III.C; and omitting Instruction 12.6's language explaining the conspiratorial agreement must be to commit a crime beyond a mere sale. *See* 1-ER-23-24; *Loveland,* 825 F.3d 555, 562; Part II.

The comments to Instruction 11.1 state: "When the charged offense is a drug conspiracy under 21 U.S.C. § 846, use Instruction 12.6 (Buyer-Seller Relationship) in place of this general conspiracy instruction." Mod. Instr. 11.1, *available at* https://www.ce9.uscourts.gov/jury-instructions/node/951 (last visited

Feb. 28, 2023).[13]  While Instruction 12.6 is an incomplete statement of

conspiracy's elements standing alone, its comments clarify it should

be given "with Instruction 12.5 (Controlled Substance—Conspiracy to

Distribute or Manufacture) if applicable." Mod. Instr. 12.6, *available*

*at* https://www.ce9.uscourts.gov/jury-instructions/node/963 (last

visited February 28, 2023). Thus, when considered together, the

Model Instructions provide that in a drug conspiracy case like this,

Instructions 12.5 and 12.6 should both be given.

Instruction 12.6 explains, *inter alia*: "A buyer-seller relationship

between a defendant and another person, standing alone, cannot

support a conviction for conspiracy. … Instead, a conviction for

conspiracy requires proof of an agreement to commit a crime beyond

that of the mere sale." The omission of this element allowed the jury to

convict Calderon of the charged conspiracy, despite insufficient

---

[13] This comment was in place during Calderon's trial in 2021, but 11.1
was then numbered 8.20, 12.5 was 9.19, and 12.6 was 9.19A. *See*
Revisions, *available at* https://www.ce9.uscourts.gov/jury-
instructions/node/1186; Former Mod. Instr. 8.20, *available at*
https://www.ce9.uscourts.gov/jury-instructions/node/475; Former
Mod. Instr. 9.19A, *available at* https://www.ce9.uscourts.gov/jury-
instructions/node/680 (last visited March 3, 2023). 12.5's commentary
was revised in March 2022, and 12.6 was revised in June 2022 to add
a tenth factor and commentary, all from *Mendoza*, 25 F.4th 730.

evidence supporting its elements. *See* Part II.

## 2. Analysis

"It is a violation of due process for a jury instruction to omit an element of the crime." *Evanchyk v. Stewart*, 340 F.3d 933, 939 (9th Cir. 2003) (citing, e.g., *United States v. Gaudin,* 515 U.S. 506, 509-10 (1995)); *Mendoza,* 11 F.3d at 128 ("when a trial judge omits an element of the offense charged from the jury instructions, it deprives the jury of its fact-finding duty and violates the defendant's due process rights").

The missing language from Instruction 12.6 and its commentary would have supplied the drug-conspiracy element that was identified as insufficiently-proven in Part II: "There must be an agreement between two or more parties to commit a crime distinct from the sale itself." *Pulgar*, 789 F.3d at 808; *Loveland*, 825 F.3d at 562 ("A relationship of mere seller and buyer, with the seller having no stake in what the buyer does with the goods, shows the absence of a conspiracy, because it is missing the element of an agreement for redistribution.") In *Ramirez*, this Court reversed for insufficient evidence of this element, where there was no evidence of a shared

stake and prolonged course of sales between the undercover agent's middleman and either party in the transactions. 714 F.3d at 1140. The omission of this necessary element from the jury's instructions here violates due process and constitutes plain error. *See* Mod. Instr. 12.6, Comment (quoting *Loveland*, 825 F.3d at 562); *Mims*, 92 F.3d at 466 (describing this as "essential element" in finding plain error); *United States v. Alferahin*, 433 F.3d 1148, 1157 (9th Cir. 2006) ("a district court's error is plain when its jury instructions fail to incorporate an element of the crime that has been clearly established by Ninth Circuit precedent").

Likewise, Model Instruction 11.1's provision that 12.6 is to be used *instead* in all §846 drug-conspiracy cases further demonstrates the error was plain. *See United States v. Bear*, 439 F.3d 565, 569 (9th Cir. 2006) (finding plain error where model instruction was available for a relied-upon defense); *United States v. Burt*, 143 F.3d 1215, 1218 (9th Cir.1998) (finding plain error where prior case law established instruction's proper parameters).

The failure to provide it in this drug-conspiracy case was clear error, even though the alleged co-conspirator was the middleman,

Jimenez, rather than the unavailable putative buyer, the informant.
As discussed in Part II, Jimenez functioned as a buyer's agent
throughout the transaction. He was asked by the informant to find a
seller and knew Calderon sold methamphetamine because he had
bought it from him before, and nothing showed he collaborated *with*
Calderon to sell drugs. Hence, there was no evidence of an agreement
between them to commit a crime together, beyond Jimenez's
solicitation of, and Calderon's acquiescence to, a sale to the
informant. *See*, *e.g.*, *Contreras,* 249 F.3d at 599-600. Any other
interpretation cannot be squared with *Ramirez*, 714 F.3d at 1140, and
would allow the Government to fabricate a conspiracy, simply by
asking one upstream seller to introduce its agent to another upstream
seller, without any evidence of their collaboration to provide the goods
or a shared stake in each other's sales. *See* Mod. Instr. 12.6, Comment
(quoting *Mendoza*, 25 F.4th 730, 736 ("a buyer-seller relationship (as
opposed to conspiracy) is particularly likely when, as here, the
downstream buyer called the upstream seller (rather than vice versa)
and when the downstream buyer was 'free to shop elsewhere'")).

The Seventh Circuit found plain error in the provision of an incomplete buyer-seller instruction where a middleman *routinely* solicited drugs from a seller for prospective buyers, while keeping a piece for himself. *Mims*, 92 F.3d at 463-66 (requiring instruction where jury "could conceivably have determined that the buyer-seller relationship which existed did not involve an overarching conspiratorial agreement"). In the few Ninth Circuit cases considering the omission of a buyer-seller instruction after rejecting an insufficient-evidence argument, this Court considered whether the other provided instructions sufficiently explained the applicable rule. *See, e.g., United States v. Montgomery*, 150 F.3d 983, 1002 (9th Cir. 1998) (finding instructions sufficient that explained "existence of a buyer-seller relationship does not prove the existence of a conspiracy …; defendants must have reached an agreement or arrived at a plan to further the manufacture, distribution, and/or importation of a controlled substance"). In *United States v. Moe*, 781 F.3d 1120, 1128 (9th Cir. 2015), the apparent catalyst for 12.6, the jury was told it had to find "there was a plan to commit at least one of the crimes charged in the indictment as an object of the conspiracy," and the only other

charged crime was for downstream distributions distinct from Moe's purchase from her alleged co-conspirator. In finding those instructions sufficient on those facts, *Moe* noted that a buyer-seller instruction may be required in other cases, including if Moe's alleged co-conspirator had been charged with both distribution and conspiracy to distribute with Moe, and hence the jury could have incorrectly believed the charged distribution to Moe was a sufficient target of the conspiracy. *Id.* at 1128, fn. 11.

By contrast here, the instructions did not directly or indirectly suggest the conspiratorial agreement must be to commit a crime beyond a mere sale. Instead, the jury was told there simply needed to be an agreement to distribute or possess with intent to distribute methamphetamine (without specifying between whom), defined as delivering or transferring possession of methamphetamine to another, and the Government's argument misinformed them that simply acquiescing to Jimenez's solicitation for this single sale was sufficient. 1-ER-17, 23-24; 5-ER-1150. Nor were they informed such further crime could be proven by consideration of the factors listed in

12.6, which generally suggest a prolonged course of sales and mutual trust.

Nor were they informed of the importance of a shared stake in the venture, which 12.6's commentary highlights by citing *Loveland's* recognition that "[a] relationship of mere seller and buyer, with the seller having no stake in what the buyer does with the goods, shows the absence of a conspiracy...." *Accord.*, Former Mod. Instr. 9.19A, *available at* https://www.ce9.uscourts.gov/jury-instructions/node/680 (last visited March 3, 2023) (quoting 825 F.3d at 652). Given the abundant controlling precedent highlighting this shared-stake factor, it belongs in 12.6's list and should have been provided here, where there was no evidence of Jimenez's stake in Calderon's single unconsummated transaction. *See* Part II (citing, *e.g.*, *Direct Sales*, 319 U.S. at 713; *Ramirez*, 714 F.3d at 1140).

Instruction 12.6 provides further applicable commentary citing *Mendoza*, 25 F.4th at 736, which did not address whether a sua-sponte instruction should have been provided because it had found insufficient evidence of conspiracy. Nevertheless, this Court's decisions recognizing this element, which parallel the Seventh

Circuit's, demonstrate 12.6's language should presumptively be
provided in drug-conspiracy cases, where the jury "could conceivably"
find the requisite agreement unproven. *Mims*, 92 F.3d at 463-66; *see
also United States v. Gee*, 226 F.3d 885, 895 (7th Cir. 2000) ("because
the line between a conspiracy and a mere buyer-seller relationship is
difficult to discern, district judges should instruct juries in
appropriate situations on the distinction"); *Loveland*, 825 F.3d at 562.

Because no other instruction provided the well-established
requirement that "a conviction for conspiracy requires proof of an
agreement to commit a crime beyond that of the mere sale," which
may be proven by factors including prolonged sales and a shared
stake, and a reasonable jury could have found no agreement to
commit a crime other than Calderon's sale to the informant, this
plain error affected Calderon's substantial right to have his
conspiracy conviction proven beyond a reasonable doubt. Mod. Instr.
12.6; *see Mims*, 92 F.3d at 466 (error affected substantial rights
where provided instruction "allowed the jury to make a finding of
guilt without determining whether the government had proved the
existence of any greater conspiratorial agreement" than the

transactions); *Alferahin*, 433 F.3d at 1157 ("A defendant's due process rights are unquestionably implicated when his purported conviction rests on anything less than a finding of guilt as to all the elements of the crime.")

A rational jury could have found Jimenez was functioning as a buyer's agent, had bought from Calderon in the past, had no non-speculative stake in the transaction on either end, did not help Calderon procure the drugs Calderon was to sell to the informant, and had not planned to receive and redistribute those drugs. Thus, without language explaining drug-distribution co-conspirators must have an agreement to commit a further crime with a shared stake, there was a genuine possibility the jury was confused that Calderon's simply accepting Jimenez's solicitation to sell drugs to the informant constituted a conspiracy to distribute, and this plain error violated Calderon's substantial rights.

Finally, upholding Calderon's conviction despite this possibility of confusion regarding the precise elements jurors must find proven beyond a reasonable doubt "seriously affects the fairness and integrity of judicial proceedings because it jeopardizes [Calderon's]

constitutional rights." *United States v. Lapier,* 796 F.3d 1090, 1098 (9th Cir. 2015); *Mims*, 92 F.3d at 466 ("where the existence of a conspiratorial agreement was closely contested and conflicting evidence was presented on the issue, the failure to ensure a jury finding on this essential element undermined the essential fairness and integrity of the trial").

Thus, these instructional omissions constitute plain error, requiring reversal of Count 8.

### C. The Inclusion of Extraneous Information Suggesting Broader Conspiracies, and the Omission of the Specific-Unanimity Requirement and Jimenez from the Instructions and Verdict Forms, Were Plain Errors.

#### 1. Relevant Instructions

The court's instructions for Count 8 omitted the charged co-conspirator, Jimenez, the amount of methamphetamine Calderon was charged with conspiring to distribute, and the specific-unanimity requirement. *See* 1-ER-23; *but see* 1-ER-17 (stating amount); Mod. Instr. 12.5, *available at* https://www.ce9.uscourts.gov/jury-instructions/node/962 (last visited Feb. 28, 2023) (providing jury "must find that there was a plan to commit at least one of the crimes

alleged in the indictment as an object or purpose of the conspiracy *with all of you agreeing as to the particular crime which the conspirators agreed to commit*") (emphasis added)).

The instructions contained extraneous information further muddying the waters of the specifically-targeted conspiracy between Jimenez and Calderon charged here:

> it is not necessary for you to find that all co-conspirators agreed to the entire scope of the conspiracy. Specifically, parties become members of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though some of them may not have had full knowledge of all the details of the conspiracy.

1-ER-23-24 (also stating, "[i]t is not necessary that all members of the conspiracy join at the same time, and one may become part of a conspiracy without full knowledge of all the details of the unlawful scheme, or the names, identities, or locations of all of the other members"). This language appears to stem from the court's uncertainty as to whether the Government's theory was that Calderon "joined in a conspiracy already underway with Jimenez." 5-ER-1058. The prosecutor clarified that Jimenez was charged with a separate conspiracy with other co-conspirators, while Count 8's

alleged conspiracy "was between Jimenez and Calderon and began on or around September 3rd." 5-ER-1058-59.

The verdict forms further broadened the scope of the charged conspiracy by allowing Calderon to be found guilty of a conspiracy with any person to distribute any detectable amount of methamphetamine, without needing to find he conspired with Jimenez to distribute at least 500 grams of methamphetamine. *Compare* 1-ER-11 *with* 6-ER-1401. It reinforced this possibility of lesser quantities, by subsequently asking the jury to select which of three separate quantities they found he had conspired to distribute or possess with intent to distribute: at least 500 grams, at least 50 grams, and less than 50 grams. 1-ER-12.

The jury instructions' omission of a specific-unanimity instruction for the target of the conspiracy, coupled with its suggestions of a preexisting broader conspiracy with multiple co-conspirators and possible targets, constituted additional plain error.

## 2. Analysis

Jurors must "unanimously agree that the defendant is guilty of participating in a particular conspiracy—i.e., of forming an

agreement with at least one other particular individual to pursue a particular criminal goal." *Lapier,* 796 F.3d at 1096. This "specific unanimity instruction is required if there is a 'genuine possibility of jury confusion' or a possibility 'that a conviction may occur as the result of different jurors concluding that the defendant committed different acts.'" *Id.* This Court applies plain error analysis to an unobjected failure to provide this specific-unanimity instruction. *Id.*

In evaluating whether such a "genuine possibility" exists, this Court "has considered a non-exhaustive list of factors including the text of the indictment, the clarity and presentation of the government's argument, the complexity of the evidence, and the clarity or ambiguity of the jury instructions." *Lapier,* 796 F.3d at 1097 (internal citations omitted).

Here, though the indictment specified a conspiracy to distribute at least 500 grams of methamphetamine between Calderon and Jimenez, and others known or unknown, the instructions and verdict form suggested the possibility of diverse conspiracies and lesser quantities of methamphetamine. 1-ER-11, 23-24; 6-ER-1401. And, the verdict form allowed for guilt based on any amount of

methamphetamine, with supplemental check-boxes identifying amounts from below 50 grams to above 500 grams. 1-ER-12; Part III.D., *infra*.

The evidence at least speculatively suggested conspiracies Jimenez and Calderon could have separately been involved in, providing a genuine basis for confusion under these instructions. For example, while there was no non-speculative evidence that Calderon collaborated with Jimenez to provide the methamphetamine the informant had asked to buy, Calderon showed up to the planned sale with another person in his car, closely followed by the car that person had exited. 5-ER-978-79. And, when it looked like Calderon might not come through, Jimenez met with a co-conspirator from a separate conspiracy count (which excluded Calderon), and agents found a kilo of methamphetamine in Jimenez's Scion. 3-ER-588; 5-ER-934, 991-92; 6-ER-1398-99. Additionally, trial counsel erroneously conceded to the jury that the charged conspiracy to possess with intent to distribute could be established by the 335 grams found in the Mustang, if they believed Calderon had placed it there. 5-ER-1189; Part IV.B.4. Thus, there is a genuine possibility of jury confusion as to what agreements

and objects could legally have supported Calderon's conspiracy conviction.[14] *See Lapier,* 796 F.3d at 1096.

Because Calderon has a constitutional right to a unanimous verdict, these plainly-erroneous instructions implicate his substantial rights and "seriously affect[] the fairness and integrity of judicial proceedings." *Lapier*, 796 F.3d at 1097-98 (also concluding "[h]aving determined that the possibility of jury confusion … was 'genuine,' we are 'not free to speculate' about what [Lapier's] jury might have concluded had it been properly instructed").

### D. The Inclusion of "Conspired" in the Possession Counts' Verdict Forms Was Plain Error.

As noted above, Count 8's verdict form omitted Jimenez and allowed Calderon to be convicted of a conspiracy to distribute less than the charged amount, by asking the jury to select one of three

---

[14] These errors were not cured by the multiple-conspiracy instruction, explaining the jury "must decide whether the conspiracy charged in the indictment existed." 1-ER-24. While important, it was insufficient to identify the particular charged conspiracy *or* that the jury must *unanimously* find it proven. Likewise, the instructions' indicating the jury must agree as to which of the three amounts they selected was insufficient to ensure unanimous agreement as to the targeted object of the conspiracy, including *who* had agreed to *what*. 1-ER-25; *see* Part III.D.

quantities of methamphetamine he had conspired to distribute or possess: at least 500 grams, at least 50 grams, and less than 50 grams. 1-ER-12. This identical language was then attached to each of the possession-for-distribution verdict forms. 1-ER-12-14. While it would have been correct to require the jury to specify which amount they had found he had possessed, the jury was erroneously instructed each time to identify the amount they found he had "*conspired* to distribute or possess with the intent to distribute." 1-ER-12-14 (emphasis added).

This was a clear and obvious error affecting Calderon's substantial right to have the elements of *possession* be unanimously proven beyond a reasonable doubt. *See Lapier*, 796 F.3d at 1096-98; *United States v. Davis*, 854 F.3d 601, 603-05 (9th Cir. 2017) (instructional error broadening bases for conviction violated Fifth Amendment "right to be tried only on charges presented in an indictment returned by a grand jury").

Count 10 was premised on the methamphetamine found in the Mustang Calderon had walked past at Daphne Street. Though the prosecutor and a witness claimed the aerial-surveillance video

showed Calderon placing a white bag in the Mustang, review of the

video paints a murkier picture. 5-ER-969, 1162; 97-3, 16:22-32-55.

Trial counsel had argued Calderon could have been carrying a Jack-

in-the-Box bag, which he deposited in the garbage bin near the

Mustang. 5-ER-1172. Given the difficulty of ascertaining exactly what

Calderon did, and the absence of any other evidence connecting him

to the methamphetamine found in Jimenez's non-working car, the

jury had ample cause to doubt he had ever possessed that

methamphetamine.

The erroneous verdict form allowed the jury to convict Calderon

of possession of methamphetamine on September 25, despite any

reasonable doubts about the Mustang, by asking them to identify the

amount he had *conspired* to distribute. Specifically, they could have

accepted the erroneous theory that Calderon had conspired with

Jimenez to distribute 12-15 kilos of methamphetamine to the

informant, and then speculatively and constructively attributed to

Calderon the methamphetamine found in Jimenez's Scion. *See* 1-ER-

24 ("More than one person can be in possession of something if each

knows of its presence and has the power and intention to control it.)

This would have been reinforced by the suggestive demonstrative timeline provided to the jury, highlighting evidence obtained on September 25, including that kilo, the Mustang methamphetamine, and 6600 grams from Jimenez's house. *See* Part IV.B.5; Mot. Jud. Notice, Ex. A.[15] Yet, this would have been error because there was no evidence Calderon knew of Jimenez's stash, let alone evidence of a conspiratorial agreement to provide it.[16] *See* Part II.

The fact that the jury was instructed its "decision as to weight must be unanimous," does not ensure they all agreed on the precise object of the conspiracy or possession, because some jurors could have found the 335 grams in the Mustang to be the object and others could have found the kilo in the Scion to be the object, while their decision to check the box for at least 50 grams would have been unanimous. 1-ER-13, 26.

Thus, the error raised a genuine possibility of confusion regarding the elements of possession charged in Count 10, affecting

---

[15] Appellant is concurrently moving for judicial notice of the demonstrative. Fed. R. Evid. 201(d).

[16] Nor was there any evidence of Jimenez's knowledge of Calderon's placing methamphetamine in his Mustang.

Calderon's substantial right to their unanimous determination beyond a reasonable doubt, as well as the fairness and integrity of the proceedings. *See Lapier*, 796 F.3d at 1097-98.

* * * *

In summary, the errors presented in Parts III.B-D were plain, individually and cumulatively violated Calderon's substantial rights, and affected the fairness and integrity of the proceedings, requiring reversal of Counts 8 and 10.

## IV. APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

### A. Legal Standard.

The Sixth Amendment guarantees defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). To establish ineffective assistance, a defendant must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms," and (2) a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.

Claims of ineffective assistance of counsel are reviewed *de novo*.

*Maiden v. Bunnell*, 35 F.3d 477, 480 (9th Cir. 1994). Although, "as a general rule, this Court does "not review challenges to the effectiveness of defense counsel on direct appeal[,]" "a defendant need not wait for collateral proceedings to obtain relief from an ineffective attorney." *Alferahin*, 433 F.3d at 1161, fn.6. Ineffectiveness claims may proceed "(1) where the record on appeal is sufficiently developed to permit determination of the issue, or (2) where the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." *Id.*

### B. Trial Counsel Provided Deficient Representation.

#### 1. Counsel Unreasonably Failed to Request the Jury Be Instructed on the Drug-Conspiracy Element of an Agreement to Commit a Further Crime and Argue It Was Not Satisfied.

The failure "to obtain an instruction on a critical element of the charged crime," resulting in abandonment of a promising defense, may constitute deficient representation. *Alferahin*, 433 F.3d at 1161 (citing *United States v. Span*, 75 F.3d 1383, 1390-91 (9th Cir.1996)). Likewise, "'failure of counsel to be aware of prior controlling precedents in even a single prejudicial instance might render counsel's assistance ineffective under the Sixth Amendment.'" *Martin*

*v. Maggio*, 711 F.2d 1273, 1280, n. 5 (5th Cir. 1983) (quoting *Nelson v. Estelle*, 642 F.2d 903, 908 (5th Cir.1981)).

Trial counsel failed to object to the conspiracy instructions that omitted the element of an agreement "to commit a crime distinct from the sale itself," with a shared stake in the redistribution. *See* Part III.B (citing, e.g., Mod. Instr. 12.6; *Pulgar*, 789 F.3d at 808; *Loveland*, 825 F.3d at 562). If counsel was aware of the Buyer/Seller rule, he failed to apprehend its established application to cases like this, where a middleman is used to broker a sale between a government agent and a seller, with no evidence of a shared stake. *See* Part II and III.B (citing, *e.g.*, *Ramirez*, 714 F.3d at 1136, 1140). Reasonable counsel would have requested the jury be instructed on this element and argued to the jury that it was not satisfied.

The only defense that counsel pursued would not have conflicted with an argument that there was no conspiratorial agreement for redistribution between Jimenez and Calderon. Specifically, counsel argued Calderon intended to rob the informant, and thus there was no *mutual* agreement between Calderon and Jimenez to distribute to him. Counsel's argument presupposed that Jimenez thought he was

conspiring with Calderon, but the jury should find Calderon was just playing along and really intended to rob the informant. 5-ER-1176-77. This argument implicitly conceded that if the jury did not find an attempt to rob, it would have to convict Calderon of conspiracy. *See* 5-ER-1176 (erroneously describing a "two-person conspiracy" with different plans and suggesting Calderon asked Jimenez to find him a customer and distribute together).

This concession was factually erroneous and totally unnecessary to effectuate the robbery defense. Counsel could have argued there was no agreement between Jimenez and Calderon to commit a crime beyond the proposed sale *and* Calderon intended on his own to rob the informant.

This failure to present controlling favorable precedent, argue its inferences to the jury, and request the jury be instructed accordingly, constituted deficient conduct, for which there could be no reasonable strategy. *See Span*, 75 F.3d at 1390 (reversing where "[c]ounsel's errors with the jury instructions were not a strategic decision to forego one defense in favor of another. They were the result of a misunderstanding of the law.") This obvious denial of Calderon's Fifth

and Sixth Amendment rights to have each element proven beyond a reasonable doubt is apparent in the appellant record. *See Alferahin*, 433 F.3d at 1159-62.

### 2. Counsel Unreasonably Failed to Object to the Omission of Conspiracy's Specific-Unanimity Instruction.

Counsel also unreasonably failed to object to the omission of the specific-unanimity instruction that the jury must all agree "as to the particular crime which the conspirators agreed to commit." *See* Part III.C. (citing Mod. Instr. 12.5; *Lapier,* 796 F.3d at 1096).

Trial counsel submitted a proposed instruction for Count 8 that was based on Model Instruction 12.5 (then 9.19), which included the specific-unanimity instruction in the seventh paragraph and changed the third paragraph to require Calderon's "knowing of [the agreement's] purposes and intending to help accomplish one or both of those purposes." 1-ER-39. However, when he discussed his proposed modification with the court, he did not call attention to the specific-unanimity instruction, and no one appeared to notice the court's instruction omitted it. 5-ER-1053, 1057-58, 1096-97. Hence, the instruction was modified to reflect the possibility of multiple alternative purposes at counsel's request, but not to instruct the jury

they all must agree "as to the particular crime which the conspirators agreed to commit." 1-ER-39.

Counsel had requested his modification because he wanted to distinguish a possession purpose from a distribution purpose, by linking the former to the methamphetamine found in the Mustang. *See* Part IV.B.4, *infra*. Specifically, counsel argued the jury should doubt there was an agreement to distribute methamphetamine because Calderon had intended to rob the informant; and while they should also doubt Calderon placed methamphetamine in the Mustang, *if* they believed he had, then counsel conceded it would support possession with intent to distribute. 5-ER-1188-91.

This argument was unreasonable. *See* Part IV.B.4. But, even if it were a reasonable strategy to distinguish the purposes, a specific-unanimity instruction would have supported that strategy by requiring the jury to unanimously agree as to *which* of the two purposes it was finding. Thus, a specific-unanimity instruction was necessary and helpful to the defense for the reasons explained in Part III.C *and* would not have conflicted with the one strategy proffered by defense counsel.

Counsel's failure to notice that the court's instruction did not include 12.5's specific-unanimity instruction, which he had included with his proposed instruction, and advocate for its inclusion at least as strongly as he (erroneously) advocated to have the instruction reflect multiple possible purposes, was unreasonable.[17]

This error obviously violated Calderon's Fifth and Sixth Amendment rights to effective counsel and a unanimous verdict. *See Alferahin*, 433 F.3d at 1161.

### 3. Counsel Unreasonably Failed to Object to Erroneous Verdict Forms.

Counsel further unreasonably failed to object to the errors in the verdict forms. *See* Part III.D; 5-ER-1055. The errors broadened

---

[17] It may have been wise to modify the portion of 12.5's instruction indicating the jury "must find that there was a plan to commit *at least one of the crimes alleged in the indictment* as an object or purpose of the conspiracy," since the object of the charged conspiracy was not alleged in any other counts. *See Moe*, 781 F.3d at 1128 (interpreting this as applying to a separately-alleged distribution count in indictment). While the jury could have understood this to refer to the purposes that counsel had attempted to distinguish with his proposed modification and argument, it would have been clearer to specify the jury must unanimously agree as to which crime constituted the agreement "to distribute or possess with intent to distribute at least 500 grams of methamphetamine, including redistribution beyond the mere sale."

the scope of how counts were charged in the indictment, effectively

lessoning the Government's burden to prove them. Count 8's error

permitted the jury to find a conspiracy with someone other than

Jimenez and for amounts of methamphetamine less than 500 grams.

1-ER-11-12. Counts 10 and 13's errors allowed the jury to substitute

their findings as to what Calderon had *conspired* to distribute for

what he *actually* possessed. 1-ER-13-14.

An attorney's inadvertent acquiescence to the broadening of the

indictment's allegations violates his client's Fifth and Sixth

Amendment rights to hold the Government to its burden to prove the

charges. *Cf. Davis*, 854 F.3d at 603-05 (instructional error broadening

bases for conviction violated Fifth Amendment). Reasonable counsel

would have carefully read the verdict forms, noticed these obvious

errors, and requested their correction.

### 4. Counsel Made an Erroneous and Prejudicial Concession on Conspiracy to Possess with Intent to Distribute.

As noted above, while arguing the jury should find Calderon

intended to commit robbery and thus did not agree with Jimenez to

distribute methamphetamine, counsel unnecessarily distinguished

*possession* with intent to distribute, while conceding the Mustang evidence could prove the latter. Specifically, counsel argued:

> This [robbery] argument pertains to the part of the conspiracy that was the … distribution of methamphetamine. All right?
>
> The other object which was possession with intent to distribute on September 25th, that refers to the Daphne material…. [I]f you find that Mr. Calderon did not put the drugs into the red Mustang, then you have to acquit him on the single count of distribution that he is charged with…. [B]ut if you find that he did do that, then what I'm saying about this conspiracy would not apply because … they only have to prove one object of the conspiracy and the two objects they are alleging are the possession of the drugs found in the Mustang.

5-ER-1189. Counsel's concession and distinction between conspiracy to possess with intent to distribute and conspiracy to distribute was erroneous, illogical, and harmful.

Because conspiracy is an inchoate offense, where each conspirator is criminally responsible for all parts of the conspiracy, there is no meaningful difference between conspiracy to distribute and conspiracy to possess with intent to distribute. *United States v. Diaz*, 190 F.3d 1247, 1253 (11th Cir.1999). By proving conspiracy to possess with intent to distribute, the Government also proves conspiracy to distribute; the latter is subsumed within the former. *Id.*

("If there is an agreement that any member of the conspiracy will possess the cocaine that is intended to be distributed, then the defendant as a member of that conspiracy is guilty of a conspiracy to possess with the intent to distribute. At the same time, he is a member of a conspiracy to distribute cocaine.")

Thus, had the methamphetamine found in the Mustang been sufficient to establish conspiracy to possess with intent to distribute, it would have also established conspiracy to distribute. There was no need to distinguish the purposes and add "at least one of those purposes" to the instruction, which effectively broadened the charged conspiracy and enabled non-unanimous verdicts. *See* 5-ER-1096-97; Part III.C.

Most important, the Mustang evidence was insufficient to prove conspiracy for two reasons: 1) as discussed in Parts II and III, there was no evidence of any agreement between Calderon and Jimenez to possess with intent to distribute methamphetamine, including no evidence Jimenez knew Calderon was bringing methamphetamine to his property and hiding it in his non-functioning car; 2) the amount of methamphetamine found in the Mustang was not "500 grams or

more," which Calderon was charged with conspiring to distribute. 6-ER-1401. There is no logical, non-speculative, connection between Calderon's leaving 335 grams in Jimenez's non-functioning car and the anticipated sale of 12-15 kilos to the informant that day, which the prosecution maintained was the targeted conspiracy, but to which Calderon arrived empty-handed. The only way the Mustang-possession conspiracy theory makes any sense is as a speculative separate conspiracy to possess a lesser quantity than that charged, with no evidence of any actual agreement with Jimenez to possess or distribute it further.

Thus, counsel's concession that the Mustang evidence, if believed, could support the charged conspiracy to possess at least 500 grams was illogical and self-sabotaging and, hence, not part of any rational defense strategy. This erroneous concession obviously denied Calderon's Sixth Amendment rights. *See Alferahin*, 433 F.3d at 1161.

## 5. Counsel Failed to Object to a Suggestive Demonstrative.

On June 15, the district court suggested the parties stipulate to providing a "non-argumentative" timeline on posterboard to help the jury "keep the dates straight." 3-ER-380-81. It suggested the timeline

provide the dates and be "very bland;" "[y]ou can't say ... "Drug Deal Starts Here." 3-ER-381. The next day, the prosecutor reported, "[w]e exchanged drafts of a proposed timeline for the jury.... There were certain things on it that Mr. Dressler didn't want included, understandably; so I think we will have a finalized one today." 3-ER-570.

On June 17, the parties presented two demonstrative timelines, with the court accepting the one defense counsel wanted. 4-ER-797-98. It was placed on an easel where the jurors could see it. 4-ER-798. On June 18, pursuant to jurors' requests, the court provided each juror a copy for "their notepads that they can take into the jury room. And I would tell them it's not evidence, but I'm not going do that unless each of you stipulate." 5-ER-924. Both attorneys so stipulated, and the court admonished the jury that "both sides think it is helpful for you to have the timeline, but ... that timeline is not a substitute for evidence. [Y]ou can only use the timeline to help you keep events organized in your own mind." 5-ER-924, 927, 1105 (providing copies).

The timeline did more than provide relevant dates. It listed items found by police on August 20 and September 25, 2018,

including a "loaded gun," "high-capacity magazine," and specific quantities of methamphetamine, which were essential elements the jury was tasked with determining. Mot. Jud. Notice, Ex. A (stating, *inter alia*, 1.83 lbs of methamphetamine found on Aug. 20, 330.5 g. in the Mustang on Sept. 25, and other amounts recovered from Jimenez's house and Scion); 5-ER-924. The stated quantities of methamphetamine differed from the amounts in the stipulated chemist exhibits. *See* 5-ER-930 (substance in truck weighed 832.4 g., with 815.1 g. of pure methamphetamine); 5-ER-933 (substance in Mustang weighed 335 g., with 317.2 g. of pure methamphetamine); 5-ER- 1162 (prosecutor stating 333 grams, then self-correcting to 330 grams). While these differences are minor, they demonstrate the risks of drawing factual conclusions for the jury on evidence subject to interpretation.

And, the attorneys codified those factual conclusions by writing the jury's notes for them. Once they were provided by the court and counsel, the jury had no reason to question them. The listings for September 11, 19, 21, and 24, were less problematic, as they simply calendared key phone calls or meetings. The listings for August 20

and September 25 could have similarly indicated the fact that arrests and searches occurred, of whom and where, without detailing the pieces of evidence obtained. Given the court's intention to keep the demonstrative non-suggestive and choosing the one counsel had preferred, there is no basis to assume a timeline which did not identify inflammatory evidence and elements would have been rejected, had counsel requested it.

Thus, reasonable counsel would have proffered a timeline that did not identify for the jury specific facts they were tasked with finding as necessary elements beyond a reasonable doubt. *Cf. People v. Centeno*, 60 Cal.4th 659, 675-76 (2014) (finding counsel ineffective for failing to object to demonstrative which lessoned burden of proof).

## C. There is a Reasonable Probability of Different Outcomes, Absent Counsel's Errors.

*Strickland* prejudice is demonstrated where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability that is sufficient to undermine confidence in the outcome." *Id.* To demonstrate a "reasonable probability," the defendant need not show that counsel's

error "more likely than not" altered the result. *Id.* at 693-94. This inquiry is not "mechanical" or "outcome-determinative," but rather considers whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* 693-94, 697.

Trial counsel's errors individually and cumulatively undermine our confidence in the outcome on Counts 8 and 10. Abundant precedent was available which had found either insufficient evidence of conspiracy or instructional error where, as here, the only alleged co-conspirator functioned as a middleman buyer's agent for a government agent. *See* Part II & III (citing, *e.g.*, *Ramirez*, 714 F.3d at 1140.) There is a reasonable probability that at least some jurors would have found no conspiracy for Count 8, had they been informed they must find an agreement to commit a crime beyond a mere sale, with Jimenez and Calderon's shared stake therein, and with unanimous agreement as to the object of that conspiracy. And once properly instructed by the court and counsel, they could not have believed the methamphetamine in the Mustang could have formed

the basis of the charged conspiracy, even if they found Calderon had placed it there.

Likewise, there is a reasonable probability of non-unanimous agreement on Count 10, had counsel not acceded to the demonstrative timeline highlighting methamphetamine obtained from Jimenez's residence (for which there was no evidence of an agreement or shared knowledge); and had counsel objected to the incorrect verdict form and thereby prevented the jury from considering what they had been told Calderon *conspired* to possess, rather than what he had actually possessed.

Therefore, the record on appeal demonstrates counsel provided ineffective assistance, which undermines our confidence in the outcome on Counts 8 and 10, requiring their reversal. *Alferahin*, 433 F.3d 1148, 1161-62; *Strickland*, 466 U.S. at 694.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment and vacate each of Calderon's convictions. Specifically, it should dismiss Calderon's conviction in Count 8 as insufficiently supported and his convictions in Count 13 and 14 as premised on

illegally-obtained evidence. It should also reverse and remand for further proceedings on Count 8 (if not dismissed) and Count 10, due to instructional errors and ineffective assistance of counsel.

Dated:  March 6, 2023                    Respectfully submitted,

_____/s/_____
Elizabeth Garfinkle
Attorney for Armando Daniel Calderon

## STATEMENT REGARDING RELATED CASES

Counsel for Calderon knows of no pending cases related to the instant matter, as defined in Circuit Rule 28-2.6(a).

Dated: March 6, 2023          _____/s/_____
Elizabeth Garfinkle
Attorney for Armando Daniel Calderon

## CERTIFICATION REGARDING FORMAT
## AND SERVICE OF BRIEF

Undersigned counsel hereby certifies that, pursuant to Federal Rule of Appellate Procedure 32(a)(7)&(f) and Circuit Rule 32-1, the attached Opening Brief is proportionately spaced, has a text typeface of 14 points or more and contains 15,966 words, as determined by the word-processing system used to prepare the brief. Appellant is

concurrently moving to file this brief in excess of the 14,000 words provided in Rule 32-1.

Pursuant to Federal Rule of Appellate Procedure 25(a)(2)(B) and Circuit Rule 31-1, undersigned counsel additionally certifies that she is electronically filing the Opening Brief and Excerpts of Record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: March 6, 2023          _____/s/_____
                                        Elizabeth Garfinkle
                                Attorney for Armando Daniel Calderon